## Department of Environmental Resources v. Fabiano

*Peter F. Baughman,* for appellant.
*Hershel J. Richman,* for Commonwealth.

BROUGHTON, Chairman of the Board, August 1, 1973.—This matter arises from an application for an on-lot sewage permit with respect to a lot in Fisher Road, Worchester Township, Montgomery County, otherwise known as R. D. 2, Lansdale, Pa. A hearing in this matter was held before the Hon. Gerald H. Goldberg, member of the Environmental Hearing Board, at Norristown, Pa., on Wednesday, April 11, 1973. A view was taken by the writer on Wednesday, July 18, 1973, at the site.

Upon the basis of testimony and evidence of record, we make the following

## FINDINGS OF FACT

1. Appellant is owner of a tract of land situated on Fisher Road, Worchester Township, Montgomery County, Pa.

2. Appellant purchased the lot in question approximately three years ago, and made an application for an on-lot sewage disposal system in December of 1972.

3. The subject property was purchased under an agreement of sale which was concluded by the parties prior to the submission of an application for a permit for an on-lot sewage treatment system by appellant.

4. The percolation tests were conducted on the tract by Edward Schlaner, a civil engineer employed by H. Metz, Inc., of Lansdale. In Mr. Metz's judgment, the results of the percolation tests were adequate to meet the standards of the Department of Environmental Resources for a single family on-site sewage disposal system, 44 minutes per inch. In the course of preparation of the application, Mr. Metz dug a six-foot-deep test pit and determined, in his opinion, that there was no evidence of a high water table within six feet of the surface, nor was there bedrock within six feet of the surface of the land.

5. Although Mr. Metz had soil courses and geology courses during the course of his civil engineering training he is not a soils scientist.

6. Mr. Metz testified that, in the course of his examination of the test pit, he did not observe mottling or other evidence of a seasonal high water table in the soil in question.

7. The application in question was denied by the Department of Environmental Resources upon the basis of an alleged seasonal ground high water table.

8. The test pit in question was visited on January 5, 1973, by John Zwalinski, Soil Scientist of the Department of Environmental Resources, and by Glen K. Stinson, Sanitarian of the Department of Environmental Resources, and was observed on another occasion by Michael Simon, Sanitarian of the Department of Environmental Resources. Each of these witnesses testified that he observed mottling within 20 to 40 inches of the soil surface.

9. Dr. Dale Harroun, a Soil Mechanics Engineer, President of a Soil and Foundation Consultant Firm, and Professor of Soil Mechanics at the University of Pennsylvania with some 25 years of professional experience in the field of engineering soils and soil consultation, testified that on Sunday, April 8, 1973, he made a fresh test pit on the Fabiano tract and, after observation thereof, in his opinion there was no mottling in any area of the test pit which he dug. Further, he examined the test pit previously dug by Mr. Schlaner and examined by Mr. Swalinski and his fellow members of the Department of Environmental Resources, and found no mottling in that trench.

## ULTIMATE FINDINGS OF FACT

1. The percolation test results incorporated in the application comply with the requirements of the

Department of Environmental Resources for single family dwellings.

2. More than four feet of soil exists between the bottom of the proposed drain pipe and the seasonal high water table.

3. The evidence with respect to mottling in the soil, at a depth of less than four feet under the ground surface, which in the context of this case must be taken as evidence of a seasonal high water table at such depth, disqualifies the premises for an on-site sewage disposal system under the terms of the regulations of the department, section 73.11.

## DISCUSSION

Reduced to its simplest terms, the narrow issue for the board to decide in this matter is whether there is or is not a seasonal groundwater table problem on the site in question. By stipulation, all other considerations are irrelevant.

The testimony on this point can be easily summarized. The expert witnesses called by appellant independently dug deep trenches on the site during fall and early spring when a seasonal high water table would appear (by coincidence. both during wet periods), and neither of them found any evidence of a seasonal high water table to depths varying from six to nine feet. Both these expert witnesses stated that no water either rose up, or ran into the trenches, a fact that the Commonwealth's own witnesses Mr. Zwalinski and Mr. Simon agreed should be observed if such a water table were to be found, provided the test was conducted in the winter and spring months. The Commonwealth's witnesses, on the other hand, testified that they observed evidence of "mottling" of the soil and that this, together with general soil

data studies, indicated a seasonal high water table. Upon cross-examination by appellant and upon examination by the board, the observations of the Commonwealth's witnesses were to the effect that they noted various splotches of color in the soil based upon the interaction of various mineral elements with water. Mr. Zwalinski described the mottling as a "pinkish gray," which had a Munsell Color Chart or a Shue Value chroma of 5YR6/2. Witnesses for appellant, on the other hand, viewing the very same soil, indicated that they observed no such splotches or other indications of a seasonal high water table.

None of the witnesses observed standing water in the test pits. However the regulation does not require the presence of standing water or free water in order to demonstrate the presence of a seasonal high water table.

Mottling is, in simplest terms, a variation in the coloring of soils. When that variation shows a concentration of redder colors in some spots, and grayer colors in others (a variation in "chroma," in particular), it will almost invariably be due to segregation of iron compounds from other components in the soil, and especially segregation of reduced (ferrous) iron compounds from oxidized (ferric) iron compounds. Iron compounds in the soil in the presence of air for any extended period of time will oxidize to the ferric state; ferric compounds are generally red. If the water table rises to a given level for prolonged periods of time, say 18 inches, as in the vicinity of the test holes examined by the department's soil scientist, John Zwalinski, then the relative absence of oxygen produces reducing conditions, and the ferric compounds are changed to ferrous compounds. Ferrous compounds are generally grayer, of a lower chroma. The ferrous compounds tend to migrate, and collect in nodules; when the water table

drops, many of these nodules will be exposed to air, and oxidized to ferric iron. Nodules, that for some reason the air did not reach, and areas of the soil from which much of the iron had earlier migrated, will appear gray.

We say "almost" invariably because it is conceivable that, in a particular case, a grayer mottle might be due to a incompletely broken up grayer parent material, especially in an area where an iron-rich parent shale had overlain an iron-deficient parent shale. This sort of condition is not, we gather, common, and where the mottling exists in soil that is derived from an almost uniformly deep red triassic shale, as the soil on this tract was, the possibility of an alternative explanation for the mottling can be dismissed altogether.

Depending as it does upon personal observation, we have encountered numerous cases in which highly qualified expert witnesses have disagreed as to whether mottling was observed in the same pit at the same time. Frequently, the department, in cross-examining witnesses for appellant in such cases, argued that an ordinary layman or even a professional engineer cannot be expected to recognize mottling or to testify with authority with respect thereto, without extensive special training in soil science. Dr. Harroun, the witness for appellant who testified in the instant matter, arguably has such special training, together with many years of experience.

Given this disagreement, the board saw no way to resolve it other than to take a view, with both experts expressing their view of what was or was not mottling. This was done on July 18, 1973, in a hole approximately 5½ feet deep dug for the purpose of having a view, at about the center of the area proposed for the leach beds. There was faint but definite mottling at

approximately 30 inches, and very distinct mottling showing at 44 to 48 inches.

Under such circumstances, we believe the law clearly requires that we find for the Department of Environmental Resources. It is well settled that the expert opinions of administrative bodies such as the Department of Environmental Resources will not be upset if they are based upon substantial evidence. In this case, the department's finding was based on substantial evidence.

We are in sympathy with the plight of the prospective home owner in the instant case. However, we have no jurisdiction to offer him equitable relief. The department has taken the position that it must rely upon the opinion of its soils scientist, and that it has no choice other than to deny a permit for an on-site sewage system in the instant case. Furthermore, the board has directly observed the mottling to which the department's expert witness testified; and we accept the conclusion that such mottling, in this case, is evidence of a high seasonal water table. Neither the Environmental Hearing Board nor the Department of Environmental Resources has the discretion to enforce or not to enforce the statute or regulations or to balance equities. We do observe, however, that it appears to the board that an alternative system would function adequately in accordance with the regulations.

Accordingly, we make the following

## CONCLUSIONS OF LAW

1. The board has jurisdiction of the parties and subject matter, and said matters are properly before the board for decision.

2. Under all of the evidence, it must be concluded

that the Department of Environmental Resources properly denied the application in the instant case based upon substantial evidence to the effect that the site has a seasonal high water table higher than that permitted by the rules and regulations of the Department of Environmental Resources for the issuance of an on-lot septic tank sewage system.

### ORDER

And now, August 1, 1973, it is hereby ordered that the appeal is dismissed, and the case remanded to the department to consider an alternative treatment system to be proposed by the applicant.